# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

TIMOTHY L. JORDAN, JR.,
      Petitioner,

vs.

WARDEN, LEBANON CORRECTIONAL
INSTITUTION,
      Respondent.

Civil Action No. 1:07-cv-559

Spiegel, J.
Hogan, M.J.

**REPORT AND
RECOMMENDATION**

Petitioner, a state prisoner, brings this case *pro se* seeking a Writ of Habeas Corpus pursuant

to 28 U.S.C. § 2254. This case is now before the Court upon the petition (Doc. 1), respondent's

return of writ and exhibits (Doc. 7), and petitioner's traverse brief. (Doc. 14).

## I. FACTS

This case involves the following facts, as summarized by the First District Ohio Court of

Appeals:[1]

> {¶ 2} In the early morning hours of April 22, 2004, RaeMone Williams was standing
> among a group of people outside the Parktown Café when he was shot to death.
> Finnis Bonner, a Cincinnati police officer, was providing off-duty security for the
> Parktown Café that morning. The café had just closed, and people were
> congregating in the street, when Bonner heard a single gunshot followed by a flurry
> of other gunshots. When the gunfire stopped, Bonner saw a man lying in the street.
> As he approached the man, several people began yelling that the shooter was leaving
> the scene in a blue Chevrolet. Bonner saw the vehicle, which was carrying at least
> two black men, leave the area, so he put out a radio broadcast. Shortly thereafter,
> police located the vehicle at Good Samaritan Hospital.
>
> {¶ 3} Around this time, the hospital's security staff notified police that two black
> men had just entered the hospital's emergency room, one of whom had been shot in

---

[1] The factual findings of the state appellate court are entitled to a presumption of correctness in the absence
of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *see McAdoo v. Elo*, 365 F.3d 487, 493-94
(6th Cir. 2004).

the shoulder. The police subsequently identified the two men as Jordan and his brother, Jermaine Higgins. They also found two other men, later identified as Jordan's cousin, Clarence ("Corny") Higgins, and his friend Jason Raven walking outside the hospital near the emergency-room entrance.

{¶ 4} Jermaine, Clarence, and Jason were taken to police headquarters for questioning. Later that morning, after Jordan had been treated and released from the hospital, he was transported to police headquarters for questioning. When Jordan arrived at the station, he was wearing a hospital gown, blue-jean shorts, and gym shoes and was holding a blue and white baseball cap.

{¶ 5} In the meantime, the police had begun collecting evidence and interviewing witnesses at the scene. One of those witnesses, Petrina White, was leaving the police station when she saw a man whose clothing matched the clothing she had seen the shooter wearing earlier that morning. When Petrina got home, she called police, gave them a description of the person she had seen, and informed them that this person was the shooter. Her description of that person's clothing was consistent with Jordan's clothing.

{¶ 6} Later that morning, the police interviewed Jordan, Jermaine, Clarence, and Jason. The men told police that they had picked up Jordan at his sister's apartment the previous evening and then driven to Martin's Bar, where they stayed for several hours. After leaving Martin's Bar, they drove to the Parktown Café, which had just closed. A crowd of people had formed in the street near the café and the parking lot of Amir's Market, a nearby grocery store. Jermaine had parked the car near the grocery store's parking lot, and the four men had gotten out of the car and gone their separate ways.

{¶ 7} Jermaine told police that he had been talking with Qianna Ginyard when he heard gunshots, turned around, and saw Jordan shoot RaeMone. He said that RaeMone fell to the ground after three shots. Jermaine then saw another man run up and shoot Jordan in the shoulder. Jermaine and Jordan then ran back to the car, and Jermaine drove Jordan to the hospital.

{¶ 8} Clarence told police that Jordan had been carrying a black semiautomatic weapon on the night of the murder. Clarence was talking to a group of people when he heard gunshots. He then heard Jermaine yelling that Jordan had been shot. Clarence told police that he, Jordan, Jermaine, and Jason then ran to the car. Clarence got into the front passenger seat, and Jason got into the back seat with Jordan. They then drove to Good Samaritan Hospital. As they were driving into the rear entrance of the hospital, Clarence and Jason got out of the car. Jason took Jordan's coat, wrapped the gun in it, and hid it in a wooded area near the hospital. Later that day, Clarence showed police where the coat and gun were hidden.

2

{¶ 9} Jason told police that he was talking to a girl in the parking lot when he heard gunshots and women screaming and then saw a man running from the corner, shooting backwards. Jason hit the ground and started crawling to the car. When he looked up, he saw Clarence, Jermaine, and Jordan running to the car. Jason told police that when Jordan got in the car, he said something like, "Yeah, I got that nigga. He didn't have shit, though." Jason understood this to mean that Jordan had robbed someone. Jordan then told the group that he had been shot and needed to go to the hospital. On the way into the hospital's driveway, Jermaine stopped the car. Jordan told Jason to grab the gun and coat and to get rid of them. Jason took the gun, wrapped the coat around it, and got out of the car with Clarence. He and Clarence then threw the gun into the woods.

{¶ 10} Jordan was also interviewed by police. After signing a written waiver of his *Miranda* rights, Jordan gave two separate statements to police. In the first statement, Jordan told police that he was urinating in an alley when he heard gunshots. He was then hit in the shoulder by a bullet and blacked out. In a second statement, which the police recorded, Jordan said that he was carrying a .38-caliber revolver on the night that RaeMone was killed because he was afraid for his life. He owed the leader of a local gang $3,500 for a drug transaction, but he had refused to pay the money, so the gang leader had made arrangements to kill him. Jordan said he was standing at the intersection of Linn and Findlay Streets near Amir's Market with Jermaine, Clarence, and Jason when he crossed the street to urinate in the alley. As he was coming back across the street, he heard gunshots and saw Jason and a man in a brown and cream-colored sweat suit shooting at each other. Jordan ran over and started shooting his gun, a chrome .38-caliber revolver. Jordan denied shooting anyone, claiming instead that he was being fired upon. After he had been shot, a friend named Anthony helped him to the car, took his revolver, and then ran from the scene. Jordan could not recall, given his injury, what had happened in the car on the way to the hospital.

{¶ 11} Jordan was subsequently charged with the aggravated murder of RaeMone Williams. He pleaded not guilty, and the case proceeded to trial. During the trial, the state presented testimony from a number of witnesses, including three women, Petrina White, Celeste Staley, and Qianna Ginyard, who were among the crowd of people outside the Parktown Café on the morning of the shooting.

{¶ 12} Petrina testified that she was sitting in a parked car in the parking lot of the grocery store next to the Parktown Café when she saw a man who was wearing a blue hat, white t-shirt, black jacket, and jeans shorts point a gun at Williams and shoot him. After Williams had fallen to the ground, Petrina saw the man reach into Williams's pants pocket. Petrina then saw the shooter and three other men run to a car and flee from the scene. That same day, Petrina called police and told them that she had seen the shooter at the police station while she was there giving a statement. She told police that the shooter had been wearing a blue baseball hat, long shorts,

and a hospital gown.

{¶ 13} Celeste Staley testified that she was standing at the corner of Findlay and Linn streets and talking to RaeMone when Jordan came up to RaeMone and said, "Nigga, you know what it is." Celeste testified that that meant the person was getting robbed. Jordan then pulled a gun from his waist and pointed it at RaeMone's chest, shooting him. RaeMone fell to the ground, and Celeste heard more gunshots. As she was running to her cousin's car, Celeste saw Jordan run to a blue car, which sped away from the scene. One day after the shooting, Celeste identified Jordan from a photo array. She testified at trial that she was absolutely certain that Jordan was the shooter that night.

{¶ 14} Qianna Ginyard testified that she was standing at the corner of Findlay and Linn Streets and talking with Jermaine when she turned around and saw Jordan standing nearby. Shortly thereafter, she heard Jordan say to RaeMone, "Let me get that chain." When RaeMone gave Jordan a strange look, Jordan shot him in the chest. RaeMone then fell face down into the street. Jordan started running, and multiple gun shots rang out. Qianna did not see where Jordan ran because she was running, too. She testified that Jermaine also had a gun that night, but that he could not get it to fire. Qianna testified that she had known Jordan prior to the shooting and that she was certain that he had shot RaeMone.

{¶ 15} Raeshawn Williams testified that he had loaned his brother, RaeMone, a necklace, which RaeMone had been wearing on the day he was killed. He identified a broken necklace that police had recovered at the scene as the necklace that RaeMone had been wearing that day.

{¶ 16} Jason, Clarence, and Jermaine also testified on behalf of the state. While Jason's and Clarence's testimony was consistent with their prior statements, Jermaine's was not. Although Jermaine had earlier testified before the grand jury that he had seen Jordan shoot Williams, he recanted this testimony at trial and stated that he could not see Jordan during the shooting because the parking lot was too crowded that night. The state impeached Jermaine with his prior statement and his grand-jury testimony. Jermaine testified that his prior statement was not true and that he had made the statement under pressure from the police, who were threatening to charge him with a crime.

{¶ 17} Cincinnati Police Detective Keith Witherell investigated the death of RaeMone Williams. Witherell testified that he interviewed Jermaine, but did not pressure him into giving a statement. He escorted Jermaine to a room at the police station and asked him to write down his observations about the shooting. Witherell and his partner then left Jermaine alone in the room. Witherell, likewise, testified that he did not pressure Jermaine to testify before the grand jury.

{¶ 18} Dr. Gary Utz, a forensic pathologist and deputy coroner in the Hamilton County Coroner's office, performed the autopsy on RaeMone's body. Utz testified that RaeMone had died from a single gunshot wound to the chest, which had perforated his heart and caused blood to accumulate in his chest cavity. Utz testified that RaeMone had most likely been shot at close range, given that the bullet hole in his t-shirt had been surrounded by a ring of soot.

{¶ 19} William Schrand, the senior firearms examiner for the Hamilton County Coroner's Crime Laboratory, examined the gun, a black nine-millimeter Glock semiautomatic pistol that police had retrieved from the wooded area near the hospital, the autopsy bullet, and three groups of ammunition that police had recovered at the scene. Schrand was able to conclude that one group, which consisted of eight cartridge casings, had been fired from the Glock semiautomatic pistol that police had recovered. A second group, consisting of four nine-millimeter cartridge cases, had been fired from another semiautomatic weapon. Schrand also examined a third group, which consisted of a single nine-millimeter bullet with conventional rifling.

{¶ 20} Schrand testified that based upon the cartridge casings found at the scene, at least two semiautomatic weapons had been fired that morning. Schrand testified that the autopsy bullet was consistent with the type and caliber of ammunition that would have been fired from a Glock, but that it had insufficient markings for him to determine to a reasonable degree of scientific certainty whether it had been fired from the Glock semiautomatic pistol that police had recovered. He did testify, however, that it was unlikely that the autopsy bullet had been fired from the other semiautomatic weapon that had been fired at the scene, because the bullet was inconsistent with the brand of ammunition that had been used for that gun.

{¶ 21} In his defense, Jordan presented testimony from his sister, Rayshaunda Higgins, and himself. Rayshaunda testified that she was residing at the Fay Apartments in April 2004 and that Jordan had been staying with her. Rayshaunda testified that Jordan had had a .38-caliber chrome revolver when he left with Jermaine, Clarence, and Jason on the night of the shooting.

{¶ 22} Jordan testified that he was carrying a .38-caliber revolver the night RaeMone was killed because he was afraid for his life. He owed the leader of a local gang $3,500 for a drug transaction, but he had refused to pay the money, so the gang leader had arranged to kill him. On the night of the shooting, Jermaine had parked the car in the parking lot of Amir's Market, which was next to the Parktown Café. He got out of the car, walked across the street, urinated in an alley, and sold two small bags of crack cocaine. As he returned across the street, he saw Jason and another man shooting at each other, so he took his pistol and fired four bullets, which were all contained in the weapon. Jordan denied shooting or robbing anyone that

5

night, maintaining instead that he had fired his pistol only because he was being fired upon.

{¶ 23} The jury found Jordan guilty of the aggravated murder of RaeMone and the accompanying gun specifications. The trial court sentenced Jordan to life imprisonment with parole eligibility after 20 years and to three years for the merged gun specifications, to be served consecutively and prior to the murder sentence.

(Doc. 7, Exh. 8 at 2-9).

## II. PROCEDURAL HISTORY

The 2004 Term of the Hamilton County, Ohio, grand jury issued an indictment charging petitioner with one count of aggravated murder as defined in Ohio Rev. Code § 2903.01(B), with special felony specifications. (*See* Doc. 7, Exh. 1). Petitioner pled not guilty to the charges in the indictment. (Doc. 7, Exh. 2).

During voir dire, the State excused two prospective African American jurors. (Doc. 8, Vol. 1, Tr. 97-100, 128-133). Petitioner moved the court orally and by written motion for a mistrial citing challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986). (Doc. 8, Vol. 1, Tr. 172-173; Doc. 7, Exh. 3). The motions were overruled following an evidentiary hearing. (Doc. 8, Vol. 5, Tr. 671-699).

The case was tried to a jury. At the close of the State's case, petitioner moved for judgment of acquittal under Ohio Crim. R. 29, which the trial court denied. (Doc. 8, Vol. 6, Tr. 762-764). At the close of all the evidence, petitioner renewed his Rule 29 motion. The court again denied the motion. (Doc. 8, Vol. 6, Tr. 819-820). On November 10, 2004, petitioner was found guilty of aggravated murder with specifications. Petitioner was sentenced to life in prison with a possibility of parole after twenty years, with an additional three year consecutive term for the specifications. (Doc. 7, Exh. 4).

With the assistance of new counsel, petitioner appealed to the Ohio Court of Appeals, First

Appellate District, raising the following assignments of error:

1. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT'S
RIGHT TO A FAIR AND IMPARTIAL JURY  UNDER THE SIXTH
AMENDMENT, AND THE RIGHT TO DUE PROCESS OF LAW AND EQUAL
PROTECTION OF THE LAWS UNDER THE FOURTEENTH AMENDMENT,
BOTH OF THE U.S. CONSTITUTION, AND TO THE PREJUDICE OF THEIR
OHIO COUNTERPARTS, ART. I., §§5 AND 16, RESPECTIVELY IN DENYING
HIS *BATSON* OBJECTION TO THE EXERCISE OF PEREMPTORY
CHALLENGES BY THE STATE TO ELIMINATE AFRICAN-AMERICAN
JURORS.

2. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT'S
RIGHT TO A FAIR AND IMPARTIAL JURY UNDER THE SIXTH
AMENDMENT, AND THE RIGHT TO DUE PROCESS OF LAW AND EQUAL
PROTECTION OF THE LAWS UNDER THE FOURTEENTH AMENDMENT,
BOTH OF THE U.S. CONSTITUTION, WHEN THE TRIAL COURT DENIED
HIS MID-TRIAL MOTION FOR MISTRIAL.

3. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT'S SIXTH
AMENDMENT RIGHT TO CONFRONTATION AND TO DUE PROCESS OF
LAW BY PERMITTING THE STATE, OVER OBJECTION, TO PRESENT THE
GRAND JURY TESTIMONY AND OTHER ALLEGED STATEMENTS
(CLAIMED TO BE PRIOR INCONSISTENT STATEMENTS) OF A WITNESS,
IMPLICATING APPELLANT, IN THE GUISE OF IMPEACHMENT EVIDENCE,
BUT WHICH WAS (1) PRESENTED TO PROVE THE TRUTH OF THE
MATTER ASSERTED, AND THEREFORE HEARSAY, AND (2) WHICH WAS
NOT SUBJECT TO CROSS EXAMINATION BECAUSE THE WITNESS
DENIED ITS TRUTH AND (3) THE GRAND JURY TESTIMONY AND OTHER
ORAL STATEMENTS WERE INSUFFICIENTLY AUTHENTICATED.

4. THE JUDGMENT OF CONVICTION IS CONTRARY TO LAW AND TO THE
DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE
CONSTITUTION OF THE UNITED STATES IN THAT THERE WAS
INSUFFICIENT EVIDENCE ADDUCED TO ESTABLISH EACH AND EVERY
ELEMENT OF EACH OFFENSE BEYOND A REASONABLE DOUBT.

5. THE JUDGMENT OF CONVICTION IS CONTRARY TO THE MANIFEST
WEIGHT OF THE EVIDENCE.

6. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY

OVERRULING HIS MOTIONS FOR JUDGMENT OF ACQUITTAL.

(Doc. 7, Exhs. 5, 6). The State filed a response. (Doc. 7, Exh. 7). On June 2, 2006, the Ohio Court

of Appeals overruled all of petitioner's assignments of error and affirmed the trial court's judgment.

(Doc. 7, Exh. 8).

Petitioner, through appellate counsel, timely appealed further to the Supreme Court of Ohio.

(Doc. 7, Exh. 9). Petitioner raised the following propositions of law:

1. A PROSECUTOR MAY NOT, CONSISTENTLY WITH THE EQUAL
PROTECTION AND DUE PROCESS CLAUSES OF THE FOURTEENTH
AMENDMENT TO THE U.S. CONSTITUTION, EXERCISE A PEREMPTORY
CHALLENGE TO AN AFRICAN-AMERICAN PROSPECTIVE JUROR WHERE
THE ACCUSED IS ALSO AFRICAN-AMERICAN, UNLESS THE
PROSECUTOR CAN FURNISH A RACE-NEUTRAL REASON FOR THE
EXERCISE OF THE PEREMPTORY CHALLENGE.

2. IT IS A VIOLATION OF THE EQUAL PROTECTION AND DUE PROCESS
CLAUSES OF THE FOURTEENTH AMENDMENT TO THE U.S.
CONSTITUTION FOR A PROSECUTOR, SEEKING TO DISCOVER A RACE
NEUTRAL REASON FOR THE EXERCISE OF PEREMPTORY CHALLENGES
TO EXCLUDE AFRICAN-AMERICANS FROM THE JURY OF AN AFRICAN-
AMERICAN DEFENDANT, UTILIZES LAW ENFORCEMENT DATABASES
NOT AVAILABLE TO THE DEFENSE TO OBTAIN INFORMATION ABOUT
AFRICAN-AMERICAN PROSPECTIVE JURORS, AND THEN ADVANCE
SUCH INFORMATION AS A "RACE-NEUTRAL" JUSTIFICATION.

3. THE RIGHT OF THE ACCUSED TO A FAIR AND IMPARTIAL JURY,
SECURED TO HIM BY THE SIXTH AMENDMENT TO THE U.S.
CONSTITUTION, AND HIS RIGHT TO DUE PROCESS OF LAW, REQUIRED
THAT THE PROSECUTION NOT USE RACE IN THE SEARCH FOR RACE
NEUTRAL REASONS TO JUSTIFY PEREMPTORY CHALLENGES, NOR AS A
BASIS FOR THE EXERCISE OF SUCH PEREMPTORY CHALLENGES.

4. THE CONVICTION OF ONE WHOSE IDENTITY AS THE PERPETRATOR
IS NOT PROVEN AT TRIAL BEYOND A REASONABLE DOUBT, IS BASED
UPON INSUFFICIENT EVIDENCE, VIOLATES THE RIGHT OF THE
ACCUSED TO DUE PROCESS OF LAW UNDER THE 14TH AMENDMENT TO
THE U.S. CONSTITUTION, AND MUST BE REVERSED, AND THE
DEFENDANT DISCHARGED.

5. PRIOR INCONSISTENT STATEMENTS OF A WITNESS INTRODUCED TO IMPEACH HIS TESTIMONY ARE NOT ADMISSIBLE AS PROOF OF THE TRUTH OF THE MATTERS ASSERTED THEREIN, AND WHERE THE PROSECUTION CHARACTERIZES THOSE STATEMENTS OF A WITNESS AS EVIDENCE OF THE GUILT OF THE ACCUSED, IN CROSS EXAMINATION OF THE ACCUSED, AND IN FINAL ARGUMENT TO THE JURY, THE ACCUSED HAS BEEN DENIED THE FAIR TRIAL TO WHICH HE IS ENTITLED BY THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.

6. WHERE A WITNESS DENIED MAKING A PRIOR INCONSISTENT STATEMENT IN TESTIMONY TO THE GRAND JURY, BEFORE THE STATE MAY IMPEACH THE WITNESS WITH SUCH TESTIMONY, IT MUST PROVE THAT THE STATEMENT WAS MADE, AND THAT THE WITNESS MADE IT, AND THE ADMISSION OF THAT EVIDENCE WITHOUT THE NECESSARY FOUNDATION DENIES THE ACCUSED HIS RIGHT TO DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION.

7. WHERE A WITNESS DENIES MAKING A PRIOR INCONSISTENT STATEMENT, OR CANNOT RECALL WHETHER OR NOT HE MADE SUCH STATEMENTS, HE IS AN UNAVAILABLE WITNESS AND THOSE ALLEGED PRIOR INCONSISTENT STATEMENTS CANNOT BE ADMITTED SINCE THE DEFENDANT CANNOT MEANINGFULLY CROSS-EXAMINE THE WITNESS WITH RESPECT TO SUCH STATEMENTS.

(Doc. 7, Exh. 10).

The State filed a response. (Doc. 7, Exh. 11). On October 18, 2006, the Supreme Court of

Ohio denied leave to appeal and dismissed the appeal "as not involving any substantial

constitutional question." (*Id.,* Exh. 12).

On July 20, 2007, petitioner filed the instant federal habeas corpus petition. (*See* Doc. 1). In

the petition, petitioner alleges seven grounds for relief:

**GROUND ONE:** The prosecution for the State of Ohio denied petitioner equal protection and due process afforded to him under the Fourteenth Amendment to the U.S. Constitution. The State of Ohio exercised a peremptory challenge on a[n] African-American prospective juror where the petitioner is a[n] African-American. The prosecution['s] race neutral reason wasn't used for all jurors just African-

9

Americans without a valid reason. Upon the state exercising its challenge, trial counsel immediately objected and in the judge's chambers properly raised a *Batson* challenge as to the prospective juror. Because the juror was African-American the prosecution gave a vague reason because (1) [the] juror didn't show any emotions to the prosecution & answered questions only with yes and no answers; (2) prospective juror was accused of lying on juror application. But ultimately the African-American juror misunderstood the form. In which the misunderstood question was on crimes that happened "20" years ago & was all misdemeanors.

**GROUND TWO:** Prosecution violated petitioner's Due Process & Equal Protection Clauses of the 14th Amendment to the U.S. Constitution by utilizing law enforcement databases that wasn't available to him & his trial counsel. The information about African-American juror in which the prosecution used was from a database that the trial counsel couldn't obtain. The information wasn't brought to the trial counsel attention until counsel utilized his *Batson* challenge. One reason the prosecution says he initiated a check upon the African-American juror was because she said on her application that she "don't drive" and she didn't answer his questions with emotion.

The prosecution used its investigation secret and didn't disclose them until trial counsel objected to its peremptory challenges to the African-American jurors. Depriving petitioner and trial counsel the equal opportunity to conduct their own independent investigation. It is very clear and convincing that the prosecution wasn't using a "race-neutral" challenge.

**GROUND THREE:** Petitioner had a right to a fair and impartial jury secured by the Sixth Amendment to the U.S. Constitution and a right to due process of law. The prosecution can not use race neutral reasons to justify peremptory challenges. The State of Ohio prosecutions used confidential law enforcement databases to search the records/background checks of three (3) African-American jurors. Two African-Americans' information was used as a race neutral basis for exercise of peremptory challenges. Both the prosecution and trial counsel stipulated to many facts, among those facts stipulated to were 1) the prosecution did not order the records of the other 19 jurors, which none of them were African-American; 2) this wasn't the first time the prosecution used law enforcement databases to investigate prospective jurors, but the prosecution stipulated that this wasn't routine practice; 3) the investigation records results was not turned over to the defense and defense promptly requested them upon finding out prosecution had run these record checks; 4) the records was only useful & helpful to the prosecution during voir dire, (precisely the prosecutions intention); 5) none of the potential jurors was under any criminal investigation when the record checks were done, and at that time the prosecution had no knowledge of any criminal activity or criminal investigation of any of the prospective jurors; 6) fact of the matter is that the state prosecution ran the African-American potential

jurors records wasn't mentioned until (sic) to the court or defense counsel until the *Batson* challenges was discussed in chambers; 7) the jury commissioner will positively testify that the prospective jurors were & are not advised that their records would/might be run by the state, prosecution's office, defense counsel or anyone else!; 8) the RCIC records are not available to the public, nor on the clerk's website.

The due process violation occurs when the state prosecution did not disclose its intentions and results of the records check. Under the Supreme Court's (3) three-step test to evaluate a prosecutor's use of a peremptory challenge to constitute a constitutional violation is (1) the defendant is a member of a cognizable group; (2) the group's members have been excluded from the defendant's jury; (3) the circumstances of the case raise an inference that the exclusion was based on race. The petitioner has and can meet the showing of the constitutional violation, 1) the defendant is a[n] African-American; 2) two (2) of the four (4) African-Americans was excluded as potential jurors was seated, the other African-American wasn't seated nor called upon because he was so far down on the list, he was never questioned.

The prosecution can not offer a valid reason or explanation for the record check and a race neutral explanation. The U.S. Supreme Court has held that the prosecution does not have to be "persuasive, or even plausible," but must be more than a mere affirmation of good faith as assumption that the challenged juror would be partial to the defendant because of their shared race.

The only explanation on why the prosecution said it ran the check on the African-American juror was because she showed no emotion in answering his questions, she was answering "yes or no!" This isn't a valid reason because all the other jurors answered their asked questions with "yes or no" answers through out their questioning. The prosecution purposefully excluded the 2 African-American prospective jurors and intentionally withheld the findings of its secret records check on the African-Americans.

**GROUND FOUR:** Under the Due Process Clause of the U.S. Constitution, petitioner's identity to be the one who fired the fatal shot in this case wasn't prove[d] beyond a reasonable doubt. His conviction is based on insufficient evidence. In all criminal cases, every element of the crime charged must be proven by the prosecution beyond a reasonable doubt, before the presumption of innocence is overcome and a lawful conviction can occur. These rights are secured by the Due Process Clause of the 14th Amendment to the U.S. Constitution. The state must prove all elements of the crime and also that the accused/petitioner is the one who committed the crime.

In the indictment and bill of particulars it said/alleged that the petitioner fired the

fatal shot that killed RaeMone Williams. These allegations wasn't proven. The prosecution eyewitnesses testified and placed two men – petitioner was no closer then three (3) feet apart. The coroner said that the fatal wound was a contact or a near contact wound. Trial counsel specifically asked the coroner if the fatal shot could have been fired from as far away as three (3) or five (5) or seven (7) feet, these are the distances testified to by three (3) witnesses from the victim and the coroner answered negative. The coroner testified that the distance was only a few inches at most, and possibly a contact wound. There was only one (1) wound to the body of the victim, the fatal shot. Since the fatal shot was a contact wound and the petitioner was at the very least 3 feet away from the victim the petitioner could not have fired the fatal shot. With the testimony and evidence presented in this present case petitioner could not have fired the fatal shot.

**GROUND FIVE:** Petitioner was denied a fair trial which he was due under the Due Process Clause of the 14th Amendment of the U.S. Constitution. The prosecution used the prior inconsistent statements of the petitioner's brother statement that he gave to the grand jury. Petitioner brother said that he saw petitioner shoot the victim but when the prosecution called Mr. Higgins (petitioner brother) he testified and explained the discrepancy between the statements and his testimony. Mr. Higgins testified that he said the petitioner shot the fatal shot because he was scared and that the police threatened to charge him with murder. Now the trial court instructed the jury that the statements was used and to be considered only as to impeach the witness and not for the truth of the statements.

The prosecution knew how damaging the statements would be, (brother testifying against his own brother), but the prosecution didn't limit the statements and grand jury testimony as to merely impeaching. The prosecution cross-examined the petitioner and asked him why did his own brother testify against him. They asked this to sway the jury to convict the petitioner. The prosecution also used the statements in the citing of their final arguments as facts to constitute petitioner's guilt. Trial counsel did object to this.

**GROUND SIX:** Before the state may impeach the witness with the inconsistent testimony, it must prove that the statement was even made. The prosecution read the testimony to the witness and the jury and without any foundation being laid for their admission. Mr. Higgins testified that he didn't recall making that statement and didn't admit to making that statement. Again by the state not offering actual proof of the statement the petitioner was denied a fair trial.

**GROUND SEVEN:** The petitioner could meaningfully cross-examine the witness Mr. Higgins (petitioner brother) because Mr. Higgins denied making the statement or even recalled the statement being made Mr. Higgins unavailable to be cross examined. Under the 6th Amendment to the U.S. Constitution petitioner has the

right to cross examine the state witness. There wasn't no meaningful opportunity at trial to cross examine Mr. Higgins at trial nor was there opportunity to cross examine Mr. Higgins at the grand jury proceedings, nor at the police investigation.

The prejudice here is manifest. Again any jury in the country that hears the testimony of his own brother accusing his own brother of murder, that jury will convict the accused. The jury should never been allowed to hear this testimony.

(Doc. 1).

## III. STANDARD OF REVIEW

On federal habeas review, the factual findings of the state appellate court are entitled to a

presumption of correctness in the absence of clear and convincing evidence to the contrary. 28

U.S.C. § 2254(e)(1). *See McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004); *Mitzel v. Tate*, 267

F.3d 524, 530 (6th Cir. 2001). This Court is bound by the state court adjudications unless those

decisions are contrary to or an unreasonable application of clearly established federal law. *Franklin*

*v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998).

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110

Stat. 1214 ("AEDPA"), a writ of habeas corpus may not issue with respect to any claim adjudicated

on the merits in state court unless the adjudication either:

1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrases "contrary to" and "unreasonable application" have independent meanings: A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the law set forth in . . . [Supreme Court] cases, or

13

if it decides a case differently that we have done on a set of materially indistinguishable facts. The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from ... [the Supreme Court's] decisions but unreasonably applies it to the facts of a particular case. The focus on the latter inquiry is whether the state court's application of clearly established federal law is objectively unreasonable . . . and an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694 (2002)(citation omitted).

Upon review of the entire record, this Court concludes that petitioner has failed to establish that the findings of the state appellate court are unreasonable as to justify federal habeas corpus relief. *See Williams v. Taylor*, 529 U.S. 362 (2000).

## IV.  GROUNDS ONE THROUGH THREE OF THE PETITION ARE WITHOUT MERIT.

In Grounds One through Three of the petition, petitioner alleges that he was denied his Fourteenth Amendment rights to equal protection and due process when the trial court permitted the prosecution to dismiss two African American jurors because of their race in violation of *Batson v. Kentucky,* 476 U.S. 79 (1986).

Exclusion of individuals from a jury based on race violates the Equal Protection Clause of the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79 (1986). *Batson* forbids race-based peremptory challenges by a prosecutor. A trial court must engage in a three-step process to evaluate a *Batson* claim:

First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Miller-El v. Cockrell*, 537 U.S. 322, 328-329 (2003) (internal citations to *Batson* omitted).

To make a *prima facie* showing of purposeful discrimination by the prosecutor, a defendant

14

must show he is a member of a cognizable racial group; the prosecutor has exercised peremptory

challenges to remove from the jury members of the defendant's race; and any additional facts and

circumstances from which an inference could be drawn that the prosecutor used the peremptory

challenges to exclude persons from the petit jury on account of their race. *Batson,* 476 U.S. at 96.

Once the defendant makes a *prima facie* showing of purposeful discrimination, the burden

shifts to the State to come forward with a race-neutral explanation for challenging black jurors.

*Batson,* 476 U.S. at 97. This is an extremely light burden. *Purkett v. Elem,* 514 U.S. 765, 768

(1995) (per curiam). At this step of the inquiry, the explanation tendered by the prosecutor need not

be persuasive nor even plausible. *Id.* As the Court explained in *Hernandez*: "A neutral explanation

in the context of our analysis here means an explanation based on something other than the race of

the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation.

Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be

deemed race neutral." *Hernandez,* 500 U.S. at 360 (plurality opinion).

At the third step of the process, the court must determine whether the defendant has

established purposeful discrimination. *Hernandez,* 500 U.S. at 359, 363 (plurality opinion) (citing

*Batson,* 476 U.S. at 98). In making this determination, the trial court must assess the plausibility

and persuasiveness of the prosecutor's race-neutral explanation. *Rice v. Collins*, 546 U.S. 333, 338

(2006); *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005). "At that stage, implausible or fantastic

justifications may (and probably will) be found to be pretexts for purposeful discrimination."

*Purkett,* 514 U.S. at 768. "If a prosecutor's proffered reason for striking a black panelist applies

just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to

prove purposeful discrimination to be considered at *Batson's* third step." *Miller-El v. Dretke,* 545

15

U.S. 231, 241 (2005).

The trial court's decision at this step is accorded "great deference" by a reviewing court. *Hernandez,* 500 U.S. at 364 (plurality opinion); *see also Batson,* 476 U.S. at 98 n.21. "Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because . . . the finding 'largely will turn on evaluation of credibility.'" *Hernandez,* 500 U.S. at 365 (plurality opinion) (quoting *Batson,* 476 U.S. at 98 n.21)).

In the typical case, the decision will turn on whether counsel's race-neutral explanation for a peremptory challenge should be believed, wherein there "will seldom be much evidence bearing on that issue" and the "best evidence often will be the demeanor of the attorney who exercises the challenge." *Id.* "[E]valuation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'"*Id.* (quoting *Wainwright v. Witt,* 469 U.S. 412, 428 (1985)). In determining the credibility of the prosecutor's race-neutral explanations, the Court must consider the prosecutor's demeanor, how reasonable or how improbable the explanations, and whether the proffered explanation has some basis in accepted trial strategy. *Miller-El v. Cockrell,* 537 U.S. 322, 339 (2003).

A trial judge's ruling that the challenge was race-neutral must be upheld unless it is clearly erroneous. *Snyder v. Louisiana,* 128 S.Ct. 1203, 1207 -1208 (2008) (citing *Hernandez v. New York,* 500 U.S. 352, 369 (1991)(plurality opinion)). In federal habeas corpus proceedings such as this, the state courts' factual findings on this issue are presumed correct unless petitioner demonstrates by clear and convincing evidence that such findings are erroneous. 28 U.S.C. § 2254(e)(1); *Purkett,* 514 U.S. at 769; *Hernandez,* 500 U.S. at 366 (plurality opinion). "Thus, a federal habeas court can only grant [the] petition if it was unreasonable to credit the prosecutor's race-neutral explanations

for the *Batson* challenge." *Rice,* 546 U.S. at 338.

In this case, the *Batson* issue arose when the prosecutor exercised peremptory challenges to excuse two African-American, prospective jurors. The State first exercised a peremptory challenge against Prospective Juror Mr. Hunter, an African-American. (Doc. 8, Vol. 1, Tr. 97-100). Petitioner objected based on *Batson v. Kentucky*. (*Id.* at Tr. 98). In support of the challenge, the prosecutor stated concerns with Mr. Hunter's responses when he spoke about representing himself at trial and his veracity when recounting his criminal conviction for receiving stolen property in which he alleged no police involvement. (*Id.* at Tr. 98). The prosecutor further noted that during a lunch break, she did an electronic search of Mr. Hunter's criminal record and discovered he had "a very significant criminal history." (*Id.* at Tr. 99). Based on the "race neutral reason" offered by the prosecution, the trial judge overruled petitioner's *Batson* challenge. (*Id.* at Tr. 100).

The prosecutor also exercised a peremptory challenge to excuse prospective juror Donna Johnson, another African-American. (*Id.* at Tr. 128). Defense counsel objected on the basis of *Batson*. (*Id.*). By way of explanation, the prosecutor stated:

> In response to the challenge, Ms. Johnson has lied about her criminal history. She has seven prior convictions, two thefts, and the rest passing bad checks. So she's lied about her criminal history.

(*Id.* at Tr. 129). The prosecutor stated that based on a suspicion triggered by Ms. Johnson's response indicating she did not drive a motor vehicle, an electronic criminal records check was performed. (*Id.* at Tr. 130). In her juror questionnaire, Ms. Johnson responded "no" to the question whether she had ever been convicted of a crime. (*Id.* at Tr. 131). The prosecutor further stated that Ms. Johnson was "extremely unresponsive" in answering the prosecutor's questions, answering only "yes" or "no" which gave the prosecutor a "bad feeling." (*Id.* at Tr. 130). Ms. Johnson was

summoned to the judge's chambers and confirmed she had previously been convicted of misdemeanor theft and passing bad check offenses. (*Id.* at Tr. 132). The trial court determined that the prosecutor "raised a non-racially oriented reason" for the peremptory challenge which need not "rise to the level of cause" and overruled petitioner's *Batson* objection. (*Id.* at Tr. 133). Petitioner orally moved for a mistrial and requested that a new jury be impaneled based on his previous *Batson* challenges. (*Id.* at Tr. 172-173). The trial court overruled the motion for a mistrial. (*Id.* at Tr. 173).

On the fifth day of trial, the court held an evidentiary hearing on plaintiff's subsequently filed written motion for mistrial. (*Id.* at Tr. 671-699). The parties stipulated that criminal records checks on prospective jurors may be obtained from the Law Enforcement Automated Data System at the request of the state prosecutor and that such records are not accessible by defense counsel or the defense bar. A criminal records check was performed on three of the four prospective African American jurors, but on no other prospective jurors. The records were not shared with defense counsel until the *Batson* challenges were raised. After hearing argument from both counsel, the trial judge overruled the motion for mistrial. *Id.*

Petitioner challenged the trial court's rulings on direct appeal. The Ohio Court of Appeals, which was the last state court to render a reasoned decision addressing the merits of petitioner's *Batson* claim, properly considered the issue utilizing the three-step analysis discussed above, as clearly established by Supreme Court precedents. The Court of Appeals rejected petitioner's claim of constitutional error, reasoning in pertinent part as follows:

### Jury Issues

{¶ 24} In his first assignment of error, Jordan contends that the trial court violated the Sixth and Fourteenth Amendments to the United States Constitution and their counterparts in the Ohio Constitution when it overruled his objections to the

18

prosecution's use of peremptory challenges to exclude two African-American jurors from the venire. In his second assignment of error, Jordan contends that the trial court also violated his Sixth and Fourteenth Amendment rights in failing to declare a mistrial.

{¶ 25} During voir dire, the state exercised peremptory challenges on two of the four African-American jurors in the venire. Jordan, who is also an African-American, objected and orally moved for a mistrial. Jordan subsequently filed a written motion for a mistrial. Following a midtrial evidentiary hearing, the trial court overruled Jordan's motion.

{¶ 26} Jordan contends that the state's use of criminal databases during voir dire to check the records of three of the four African-American jurors in the venire, as well as its subsequent use of peremptory challenges to exclude two of those African-American jurors, violated his Fourteenth Amendment right to equal protection, as well as his Sixth Amendment right to have a jury drawn from a fair cross-section of the community.

{¶ 27} In *Batson v. Kentucky,* the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits racial discrimination in the exercise of peremptory challenges. *Batson* created a three-part test for determining whether a prosecutor's use of a peremptory challenge is racially motivated. First, the defendant must make a prima facie showing of intentional discrimination by demonstrating that members of a cognizable racial group were peremptorily challenged and that the facts and any other relevant circumstances raise an inference that the prosecutor used the peremptory challenges to exclude jurors on account of their race.

{¶ 28} Second, once the defendant makes a prima facie case of discrimination, the state must then provide a race-neutral explanation for the peremptory challenge. The state's explanation need not rise to the level of a "for cause" challenge; rather, it need only be based on a juror characteristic other than race and not be pretextual. Third, the trial court must determine whether the prosecutor's race-neutral explanation is credible or is instead a pretext for unconstitutional discrimination. "A trial court's finding of no discriminatory intent will not be reversed on appeal absent a determination that it is clearly erroneous."

{¶ 29} The United States Supreme Court has likewise held that the right to a fair and impartial jury under the Sixth Amendment entitles criminal defendants to a jury drawn from a fair cross-section of the community. [citing *Duren v. Missouri,* 439

U.S. 357 (1979)] "In order to establish a prima facie violation of the fair-cross-section requirement, a defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." [*Id.* at 364] "Systematic" means caused by or inherent in the system by which juries are selected.

### Peremptory Challenges

{¶ 30} The record reveals that the state exercised peremptory challenges on two African-American jurors in the venire. With respect to the first juror, Mr. Hunter, the state had collectively asked the jurors during voir dire if any of them had had any contact with police. Hunter informed the state that he had had some contact with the police, but that his contact had only been positive. When the state inquired about a 1994 criminal conviction that Hunter had listed on his juror questionnaire, Hunter replied that he had been charged with receiving stolen property, but that he had only been cited to go to court.

{¶ 31} During the lunch break, the state's attorney, suspecting that Hunter had been untruthful about his criminal contacts, checked his criminal record. She also checked the records of two other jurors, Mr. Hawthorne and Ms. Johnson, who had indicated on their jury questionnaires that they did not drive. Hawthorne and Johnson are also African-Americans.

{¶ 32} Following the lunch break, the state exercised a peremptory challenge on Hunter. Defense counsel objected, raising a *Batson* challenge to the juror's exclusion. The state explained that it had challenged Hunter because he had been untruthful about his criminal record. When defense counsel argued that the state's reason for excluding Hunter was discriminatory because Hunter had revealed his prior record, the state explained that Hunter had a more extensive criminal history, as demonstrated by computer printouts from the Regional Crime Information Center ("RCIC") and the National Crime Information Center ("NCIC"), than he had admitted on his juror questionnaire and during voir dire. The trial court, finding the state's explanation for Hunter's exclusion to be race-neutral, overruled the *Batson* challenge.

{¶ 33} The second juror, Ms. Johnson, claimed during voir dire never to have been convicted of a crime, with the exception of a traffic ticket. When the state sought to remove her with one of its peremptory challenges, Jordan made a *Batson* challenge. During an in-chambers discussion, the trial court asked the state for a race-neutral

20

explanation for the challenge. The state replied that it was striking Johnson because she had lied about her criminal record. The state told the court that it had also checked Johnson's record over the lunch break because Johnson had indicated on her jury questionnaire that she did not drive a motor vehicle. The state explained that it was also striking Johnson because she had been unresponsive to questions during voir dire.

{¶ 34} Following this exchange, the trial court called Johnson into chambers and questioned her about her criminal record. Johnson admitted that she had seven misdemeanor convictions, two for theft and five for passing bad checks, but maintained that she had not disclosed them because they were not recent convictions. The state pointed out, however, that the jury questionnaire did not distinguish between recent and older convictions, but simply asked whether the juror had "ever been convicted of a crime." The trial court, finding that the state had presented a race-neutral reason for Johnson's exclusion, overruled the *Batson* challenge.

### Motion for Mistrial

{¶ 35} Jordan subsequently filed a written motion for a mistrial, in which he argued that the prosecuting attorney's use of the Law Enforcement Automated Data System ("LEADS") to check the criminal records of three of the four African-American prospective jurors in the venire, as well as its decision to ultimately exclude two of those African-American jurors, violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

{¶ 36} During an evidentiary hearing on the mistrial motion, the parties stipulated that the state had checked the criminal records of three African-American jurors, juror Hunter, who it had suspected was lying about his criminal history, and jurors Hawthorne and Johnson, who had indicated on their jury questionnaires that they did not drive. The state stipulated that it had not checked the criminal record of a fourth African-American in the venire, Ms. Bagget-Bell, and that she had never made it to the jury box. The parties further stipulated that the state had not turned over the criminal records to defense counsel during voir dire-that defense counsel had learned of the records only during the in-chambers discussions of his *Batson* challenges.

{¶ 37} An RCIC representative testified that RCIC was bound by the LEADS manual and rules and regulations and that LEADS permitted prosecuting attorneys to obtain the records of prospective jurors. Richard Goldberg, a criminal defense attorney in Hamilton County and President of the Greater Cincinnati Criminal Defense League, testified that it would have been advantageous for defense counsel to have had access to the information in these criminal databases during voir dire.

{¶ 38} At the conclusion of the hearing, the trial court overruled Jordan's motion for a mistrial. The trial court found that the state had not violated the Ohio Administrative Code or Jordan's constitutional rights by using the databases during voir dire, because it had checked the records based on suspicions it had as a result of routine inquiry during voir dire. The court also found that these suspicions were sufficient race-neutral reasons under *Batson* for it to exercise the peremptory challenges on the two African-American jurors. The trial court further found that while the state had not immediately disclosed the records, it had disclosed them to defense counsel during the *Batson* challenges.

### Discussion

{¶ 39} With respect to Jordan's arguments relating to the state's use of the peremptory challenges, the record reveals that the state provided a race-neutral explanation for striking both Hunter and Johnson from the jury. Both jurors had been less than honest about their criminal records. Juror Hunter had denied any negative contact with the police, but actually had a very significant criminal history. Juror Johnson claimed to have never been convicted of a crime and, with the exception of a traffic ticket, to have never been to court, but in reality she had seven prior convictions for theft and passing bad checks. A juror's lack of candor or dishonesty on a juror questionnaire is a valid race-neutral reason for challenging that juror. Consequently, we cannot say that the trial court erred in overruling Jordan's *Batson* challenges.

{¶ 40} Jordan also failed to show that the state systematically used the criminal databases to exclude African-Americans from the jury-selection process. While the state checked the records of three of the four African-American jurors in the venire, it exercised peremptory challenges on only two of them, Hunter and Johnson. The third African-American, Hawthorne, who had no criminal record, was never challenged by the state and continued to serve on the jury. The state did not check the criminal record of the fourth African-American juror, Ms. Bagget-Bell. Thus, the record supports the state's argument that it did not use the information from these criminal databases to systematically exclude African-American jurors. Because Jordan failed to show either a *Batson* violation or that his jury lacked a fair cross-section of the community, we overrule his first and second assignments of error.

(Doc. 8, Exh. 8 at 9-16) (footnotes omitted).

This Court concludes that the First District Court of Appeals' decision on petitioner's

*Batson* claim was not an objectively unreasonable application of *Batson* and its progeny. Petitioner

established that he and the two prospective jurors who were excused are African American.
However, the explanations given by the prosecution were facially valid and race neutral. In addition
to the reasons set forth by the Court of Appeals, this Court notes that the record reflects that the
prosecutor's suspicions were raised as to the two jurors who did not drive because lack of driving
privileges can be the result of drug convictions or driving under suspension convictions. (Doc. 8,
Vol. 5 at Tr. 683). The prosecutor's suspicions were further raised when Mr. Hunter, a prospective
African American juror, "proudly said that he prevailed at trial in which he represented himself"
and testified there were no police officers involved in his case involving a criminal conviction for
receiving stolen property. (Doc. 8, Vol. 1 at Tr. 98). Further investigation showed that Mr. Hunter
was not truthful about his criminal history. (Doc. 8, Vol. 1 at Tr. 99-100, Vol. 5 at Tr. 681).
Likewise, the second African American juror struck, Ms. Johnson, was untruthful about her
criminal history on her juror questionnaire. (Doc. 8, Vol. 1 at Tr. 129-133, Vol. 5 at Tr. 682). The
prosecutor's explanations evinced no inherent discriminatory intent and are deemed race-neutral.
*See Purkett,* 514 U.S. at 768 (finding prosecutor's proffered reason for striking an African-
American prospective juror–that he had a moustache, beard, and long, unkept hair–satisfied burden
of articulating a nondiscriminatory reason for peremptory challenge). The Court also notes that
courts have upheld peremptory challenges to jurors with criminal backgrounds finding that reason
sufficiently race-neutral under *Batson. See United States v. Watford,* 468 F.3d 891, 912 -913 (6th
Cir. 2006); *United States v. Forrest,* 402 F.3d 678, 687 (6th Cir. 2005).

In addition, petitioner has failed to provide any evidence showing that similarly situated
white jurors with criminal histories were not struck from the jury panel. In *Miller-El,* the Supreme
Court recognized that "[i]f a prosecutor's proffered reason for striking a black panelist applies just

23

as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." This comparative juror analysis is inapplicable in the instant case where petitioner has pointed to no evidence demonstrating that white jurors possessed the same characteristics for which Mr. Hunter and Ms. Johnson were stricken. Thus, this is not a case where the prosecutor's proffered explanation for striking an African American juror applied to an otherwise-similar non-African American juror who was permitted to serve. *Cf. Miller-El,* 545 U.S. at 241. The trial judge accepted the prosecutor's explanations as credible and petitioner has not met his burden of showing that it was "unreasonable to credit the prosecutor's race-neutral explanations." *Rice,* 546 U.S. at 338. Petitioner has failed to demonstrate by clear and convincing evidence that such findings are erroneous. 28 U.S.C. § 2254(e)(1). Upon review of the trial transcript, this Court agrees with the Ohio Court of Appeals' determination that the record supports the factual bases for the state's peremptory challenges as to prospective jurors Hunter and Johnson.

Further, petitioner has neither cited nor submitted clear and convincing evidence of purposeful discrimination by the prosecution sufficient to rebut the presumption of correctness to be accorded the state courts' conclusion that the prosecutor did not discriminate on the basis of race in exercising the peremptory challenges in this case. *See* 28 U.S.C. § 2254(e)(1); *Purkett,* 514 U.S. at 769; *Hernandez,* 500 U.S. at 364-66; *Batson,* 476 U.S. at 98 n.21.

Accordingly, petitioner has not demonstrated that the state courts' adjudication of his *Batson* claim resulted in a decision that is contrary to, or involves an unreasonable application of, clearly established Supreme Court precedent, or is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. §2254(d); *see also*

24

*Williams,* 529 U.S. at 402-03 (O'Connor, J.).

To the extent Ground Three of the petition asserts that petitioner was denied a jury drawn from a fair cross-section of the community in violation of the Sixth Amendment his claim is without merit. To demonstrate a violation of his Sixth Amendment right to an impartial jury, petitioner must prove that the jury venire from which the petit jury was selected did not represent a fair cross-section of the community. *Duren v. Missouri*, 439 U.S. 357, 358-360 (1979). "[T]he interference with the criminal defendant's ability or opportunity to draw a jury from a representative pool is the principal injury with which the Constitution is concerned." *Smith v. Berghuis*, __ F.3d __, 2008 WL 4330408, *8 (6th Cir. Sept. 24, 2008). In order to establish a prima facie violation, petitioner must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 364. Petitioner's Sixth Amendment right to a fair cross-section of the community in the jury selection process does not, however, extend from the venire to the petit jury. *See Holland v. Illinois*, 493 U.S. 474, 478 (1990) (citing *Lockhart v. McCree*, 476 U.S. 162, 173 (1986); *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)). Thus, a defendant has no right to a petit jury comprised of a fair cross-section of the community and the Sixth Amendment does not ban peremptory challenges resulting in the exclusion of particular jurors from the petit jury. *See Holland*, 493 U.S. at 480-481, 483.

In the instant case, the Ohio Court of Appeals ruled that the use of electronically based means

to investigate the criminal records of some, but not all African American members of the venire, did not show a systematic exclusion of African Americans from the jury pool. Of the four African Americans in the venire, the criminal records of three were checked. Two of the African American jurors were ultimately excluded from the petit jury and one served. The fourth African American juror's record was not checked. The record in this case shows that use of the criminal records database did not result in the systematic exclusion of African Americans from the venire.

Nor has petitioner presented any other evidence establishing that African Americans were not fairly represented in the venire from which his petit jury was selected. In addition, since the Sixth Amendment does not apply to petit juries, petitioner's claim that his jury did not represent a fair cross section of the community is without merit. *See Holland*, 493 U.S. at 478. Petitioner thus failed to establish a prima facie case under *Duren* and the Ohio Court of Appeals' decision on this claim was neither contrary to nor an unreasonable application of clearly established federal law.

Petitioner, therefore, is not entitled to habeas corpus relief based on claims alleged in Grounds One through Three of the petition.

## V. GROUND FOUR OF THE PETITION IS WITHOUT MERIT.

In his fourth ground for relief, petitioner contends his aggravated murder conviction was not supported by sufficient evidence.

The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case from conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *In re Winship*, 397 U.S. 358, 364 (1970). In analyzing claims of insufficient evidence, the Court

26

must determine whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). This standard reserves to the trier of fact the responsibility to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts. *Id.* at 318-319.

On habeas corpus review, the federal court conducts an independent review of the state court record in analyzing petitioner's sufficiency of the evidence claim. *Nash v. Eberlin*, 437 F.3d 519, 525 (6th Cir. 2006). However, the Court "does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). "The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim." *Id.* In addition, circumstantial evidence may be sufficient to support a conviction and such evidence need not remove every reasonable hypothesis except that of guilt. *See Jackson,* 443 U.S. at 326; *Walker v. Russell*, 57 F.3d 472, 475 (6th Cir. 1995); *Jamison v. Collins,* 100 F. Supp.2d 647, 705 (S.D. Ohio 2000), *aff'd*, 291 F.3d 380 (6th Cir. 2002).

In the instant case, petitioner contends that the State failed to present sufficient evidence to support his identity as the person who fired the fatal shot. He cites to the testimony of Dr. Utz, the deputy coroner, who stated that the shot was fired from only "inches away" from the victim's body given the ring of soot on the victim's t-shirt. (Doc. 8, Vol. 4 at Tr. 608). Petitioner contends that the State's witnesses all testified that he was somewhere between two to seven feet from the victim at the time of the shooting. (Doc. 8, Vol. 2 at Tr. 248, Vol. 3 at Tr. 300, 368). He then cites to the cross-examination of Dr. Utz which indicates the ring of soot would not be present if the shooter

27

were three, five, or seven feet away. (Doc. 8, Vol. 4 at Tr. 612). Petitioner concludes that this evidence shows he could not have been the shooter.

The First District Court of Appeals overruled petitioner's insufficiency of evidence claim as follows:

{¶ 49} When reviewing a trial court's denial of a Crim. R. 29 motion, this court applies the same standard of review that it would in reviewing a challenge based upon the sufficiency of the evidence. When a defendant claims that his conviction is supported by insufficient evidence, this court must review the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found all the elements of the crime proved beyond a reasonable doubt.

\*
\*
\*

{¶ 50} To convict Jordan of aggravated murder, the state had to show that Jordan had purposely caused RaeMone's death "while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * the offense of robbery * * *."

{¶ 51} Multiple witnesses testified that Jordan was carrying a black semi-automatic weapon on the night of the murder. Celeste and Qianna testified that they were standing near RaeMone when they saw Jordan approach him, demand his property, and shoot him in the chest. Petrina testified that she was sitting in her car when she saw Jordan shoot RaeMone and then rifle through his pockets. Moreover, Jason testified that immediately after he heard gunshots, Jordan ran to the car and told him that he had robbed someone. Jason and Clarence, at Jordan's request, then hid Jordan's gun in the woods near the hospital. With Clarence's assistance, the police subsequently recovered a black semiautomatic weapon from the woods. Ballistics testing confirmed that eight cartridge casings at the scene had been fired from the gun and that the autopsy bullet was consistent in type and caliber with the ammunition for the gun. When viewed in the light most favorable to the state, the evidence was sufficient to convict Jordan of the aggravated murder of RaeMone. Thus, the trial court did not err in overruling Jordan's Crim. R. 29 motion.

{¶ 52} Nor can we conclude, given our review of the record, that the jury lost its way and created such a manifest miscarriage of justice that we must reverse Jordan's conviction and order a new trial. Jordan attacks the credibility of the state's eyewitnesses. He contends that inconsistencies in their testimony regarding the robbery and shooting render his conviction against the manifest weight of the evidence. Jordan points out that the state's eyewitnesses all testified that he was

28

standing anywhere from two to five feet from RaeMone when he shot him, while the coroner testified that RaeMone had been shot at close range. Thus, Jordan contends, he could not have been the person who killed RaeMone.

{¶ 53} The state presented several witnesses who testified that Jordan had fired a single shot at RaeMone that was followed by a flurry of other gunshots. RaeMone died from a single gunshot wound to the chest. The jury could have reasonably concluded that Jordan had fired the fatal shot that night and that the eyewitnesses, who had utilized a series of photos throughout the trial to show the jury where RaeMone and Jordan were standing at the time of the shooting, had simply overestimated the distance between Jordan and RaeMone at the time of the shooting. We, therefore, overrule Jordan's fourth, fifth, and sixth assignments of error and affirm the trial court's judgment.

(Doc. 7, Exh. 8 at 18-20) (internal footnotes omitted).

Upon review of the entire record, this Court agrees with the finding of the state court of appeals that the evidence supported a finding of guilt beyond a reasonable doubt. Although the deputy coroner testified that the shot was fired at close range to RaeMone's body due to the soot residue on his t-shirt, the jury could have reasonably concluded that the eyewitnesses overestimated the distance between petitioner and RaeMone at the time of the shooting. The State presented strong eyewitness testimony from which the jury could find beyond a reasonable doubt that petitioner was the shooter.

The State presented the testimony of Petrina White, who testified she observed a man wearing a blue baseball cap, white shirt, and dark shorts raise his arm towards RaeMone. She heard a shot, saw RaeMone fall to the ground, then watched the man bend down and go through RaeMone's pockets. (Doc. 8, Vol. 2 at Tr. 246-249). Later that night, Ms. White met with police at the station to give a statement. When leaving the station, she observed the police escort a man wearing a blue baseball cap, a hospital gown, and shorts into the station. She recognized the person

29

as the person who shot RaeMone. When she arrived home, she telephoned the police detective and related what she had seen upon leaving the station. (*Id.* at Tr. 254-256).

Qianna Ginyard testified that on the night of the shooting, petitioner was wearing a blue cap, white t-shirt, black jacket and blue jean shorts. She testified that she observed petitioner shoot RaeMone in the chest. She testified she was standing two to five feet from petitioner when he shot RaeMone. (Doc. 8, Vol. 3 at Tr. 299). She testified she got a good look at the gun petitioner was holding. (*Id.* at Tr. 306). Ms. Ginyard identified petitioner in court as the person who shot RaeMone, that she had known petitioner for about seven or eight years, and that she was "a hundred percent" positive that petitioner was the person who shot RaeMone. (*Id.* at Tr. 307-308).

The State also presented the testimony of Celeste Staley. Ms. Staley testified that she had been previously acquainted with both RaeMone and petitioner. (*Id.* at Tr. 366-368). She testified that she was standing approximately four and one-half to five feet from petitioner on the night of the shooting. She stated that petitioner was wearing a light blue ball cap, white t-shirt, black jacket, and blue jean shorts. (*Id.* at Tr. 368). Ms. Staley testified she had a clear view of both RaeMone and petitioner, and heard petitioner say to RaeMone, "Nigga, you know what it is" which, according to Ms. Staley, "in layman's terms means you're getting robbed." (*Id.* at Tr. 372). She then observed petitioner pull out a gun from his waistband, point it at RaeMone's chest, and start to shoot. (*Id.* at Tr. 374). She testified that the first shot that was fired that evening came from petitioner's gun, then other shots followed. (*Id.* at Tr. 374). Ms. Staley testified that she was "a hundred percent sure" that petitioner shot RaeMone. (*Id.* at Tr. 377-378).

The State also called Jason Raven as a witness. Mr. Raven testified that after hearing the

30

shots, he crawled to the car and got in. Petitioner entered the vehicle and stated, "Yeah I got that nigga. He didn't have shit though" which Mr. Raven understood to mean that he had robbed someone. (*Id.* at Tr. 425-426). Mr. Raven testified that en route to the hospital, he and Clarence Higgins, at petitioner's request, wrapped petitioner's gun in petitioner's jacket and threw it in the woods. (*Id.* at Tr. 429).

Although there was some discrepancy between the deputy coroner's conclusion that RaeMone was shot at close range and the distance between RaeMone and petitioner at the time of the shooting to which the other witnesses testified, the jury apparently resolved the conflict in favor of the prosecution. "*Jackson* makes clear that 'a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *O'Hara v. Brigano,* 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 326). There was sufficient evidence from which any rational trier of fact could find that petitioner was the shooter and was guilty of aggravated murder beyond a reasonable doubt. When viewing all of the evidence in the light most favorable to the prosecution, *see Jackson v. Virginia, supra,* and for the reasons discussed by the state appellate court, this Court concludes that the evidence was constitutionally sufficient to sustain petitioner's conviction.

The Ohio Court of Appeals' determination that sufficient evidence supported petitioner's conviction for aggravated murder was therefore not contrary to or an unreasonable application of clearly established federal law. *See Jackson*, 443 U.S. at 319. Therefore, Ground Four of the petition is without merit and should be denied.

31

## VI. GROUNDS FIVE THROUGH SEVEN OF THE PETITION ARE WITHOUT MERIT.

Grounds Five and Seven of the petition assert petitioner was denied a fair trial under the

Fourteenth Amendment and denied his right to confrontation under the Sixth Amendment when the

prosecution used Jermaine Higgins' prior grand jury testimony and statements to police as

substantive evidence of guilt and not for impeachment purposes only. Ground Six alleges that

petitioner was denied a fair trial when the prosecutor used the prior inconsistent statements of Mr.

Higgins without any foundation for their admission and without proof that the statements were even

made.

The Ohio Court of Appeals was the only state court to issue a reasoned decision addressing

the merits of these claims, which were raised on direct appeal in the third assignment of error. The

court rejected the assignment of error, reasoning in relevant part as follows:

> {¶ 41} In his third assignment of error, Jordan contends that the trial court violated
> his Sixth Amendment right to confrontation when it permitted the state to present his
> brother Jermaine's statement to police and his grand-jury testimony in the guise of
> impeachment evidence.

> {¶ 42} At trial, the state called Jordan's brother, Jermaine Higgins, to testify that he
> saw Jordan shoot Williams. When Jermaine testified instead that he could not really
> see Jordan that night, the prosecuting attorney secured a finding by the trial court that
> Jermaine was a hostile witness and proceeded to impeach him with a handwritten
> statement that he had given to the police, as well as with his grand-jury testimony.

> {¶ 43} Jordan contends that the trial court erred by permitting the state to impeach
> Jermaine. But the record reveals that the state made the requisite showing of surprise
> and affirmative damage under Evid. R. 607 to impeach Jermaine with his prior
> statement and grand-jury testimony. While Jermaine had told the police and the grand
> jury that he had observed Jordan shoot RaeMone, he surprised the state by testifying
> at trial that he could not see Jordan the night of the shooting. Consequently, we
> cannot say that the trial court erred in allowing the state to impeach Jermaine with his
> prior statements.

{¶ 44} Jordan, relying on *State v. Duncan,* next contends that even if the state made the requisite showing under Evid. R. 607, it improperly used Jermaine's statements as substantive evidence of his guilt. But *Duncan* is factually distinguishable. In *Duncan,* we held that the trial court committed error in admitting the grand-jury testimony of a witness because the testimony "involved statements made by others, offered for the truth of the matter of those statements," and not for impeachment purposes. In contrast, Jermaine's grand-jury testimony involved only what Jermaine had observed and did not involve the statements of others. Furthermore, the trial court gave the jury a limiting instruction directing it to consider Jermaine's prior statements for impeachment purposes only.

{¶ 45} Jordan further contends that the state utilized Jermaine's testimony as substantive evidence of his guilt in closing argument. But the prosecutor framed the issue of Jermaine's statements as one of credibility, not one of substantive proof of Jordan's guilt. The prosecuting attorney encouraged the jury to think about how Jermaine testified and to take into account the bias or interest that he might have had when weighing his testimony.

{¶ 46} Jordan additionally maintains that the trial court violated his right to confrontation under the Sixth Amendment to the United States Constitution when it admitted Jermaine's out-of-court statements into evidence.

{¶ 47} In *Crawford v. Washington,* the United States Supreme Court held that the Confrontation Clause prohibits the introduction of out-of-court testimonial statements by witnesses who are not called to testify at trial. But the court expressly stated that "the Confrontation Clause * * * does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Because Jordan was given the opportunity to cross-examine Jermaine at length about his prior statements, and because his prior statements were admitted solely for the nonhearsay purpose of impeachment, they raised no Confrontation Clause concerns. We, therefore, overrule his third assignment of error.

(Doc. 7, Exh. 8 at 16-18).

A defendant in a criminal trial has the right to confront the witnesses called against him. U.S. Const. amend. VI. The Confrontation Clause of the Sixth Amendment secures the right of a defendant to cross-examine an adverse witness for the purpose of uncovering possible biases and

exposing the witness's motivation for testifying. *See Davis v. Alaska,* 415 U.S. 308, 316-317 (1974).

Because cross-examination is "the most effective method by which a defendant can test the truth of

testimony given against him," *Stevens v. Bordenkircher,* 746 F.2d 342, 346 (6th Cir. 1984), the right

of confrontation and cross-examination is considered "an essential and fundamental requirement" for

a fair trial. *Barber v. Page,* 390 U.S. 719, 721 (1968) (quoting *Pointer v. Texas,* 380 U.S. 400, 405

(1965)). *See also Kentucky v. Stincer,* 482 U.S. 730, 739 (1987).

 The admission of hearsay statements by a declarant not present or otherwise available for

cross-examination at trial may trigger concerns of a possible violation of the defendant's right under

the Sixth Amendment's Confrontation Clause to confront and cross-examine the witnesses against

him. *See Crawford v. Washington,* 541 U.S. 36, 50-60 (2004). In *Crawford,* the United States

Supreme Court held that testimonial out-of-court statements offered against the defendant to

establish the truth of the matter asserted are not admissible where the defendant had no opportunity

(either before or during trial) to cross-examine the witness, regardless of the reliability of the

admitted statements. *Crawford,* 541 U.S. at 68-69 (abrogating *Ohio v. Roberts,* 448 U.S. 56 (1980)).

The Supreme Court stated, "Where testimonial evidence is at issue . . . the Sixth Amendment

demands what the common law required: unavailability and a prior opportunity for cross-

examination." 541 U.S. at 68.

 This case does not trigger any concerns under the Sixth Amendment's Confrontation Clause

because the out-of-court declarant, Jermaine Higgins, testified at petitioner's trial and was subjected

to unrestricted cross-examination by defense counsel. In addressing this situation, the Supreme

Court in *Crawford* stated:

> [W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. *See California v. Green,* 399 U.S. 149, 162, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). It is therefore irrelevant that the reliability of some out-of-court statements "'cannot be replicated, even if the declarant testifies to the same matters in court.'" *Post,* at 1377 (*quoting United States v. Inadi,* 475 U.S. 387, 395, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)). The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.

*Crawford,* 541 U.S. at 59 n. 9. *See also United States v. Kappall,* 418 F.3d 550, 554 (6th Cir. 2005).

Because Mr. Higgins testified at trial and was subject to cross-examination, petitioner cannot

establish a Confrontation Clause violation in this case. *See United States v. Owens,* 484 U.S. 554,

560 (1988) (where a hearsay declarant is present at trial and subject to unrestricted cross-

examination, the "traditional protections of the oath, cross-examination, and opportunity for the jury

to observe the witness' demeanor satisfy the constitutional requirements" of the Sixth Amendment).

Moreover, Mr. Higgins' prior statements were not admitted for the truth of the matter

asserted, but to impeach his trial testimony that he did not see petitioner fire the fatal shot. Where a

prior statement is admitted solely for the non-hearsay purpose of impeachment, it raised no

Confrontation Clause problem. *Crawford,* 541 U.S. at 59 n. 9 ("The Clause also does not bar the use

of testimonial statements for purposes other than establishing the truth of the matter asserted. *See*

*Tennessee v. Street,* 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985).").

Petitioner nevertheless argues that the trial court improperly admitted the prior statements

without evidentiary foundation. He also contends the prosecutor improperly used Mr. Higgins'

statements in closing argument as substantive evidence of his guilt thereby denying him a fair trial.

To the extent petitioner claims the trial court violated Ohio law in permitting the prosecutor

to use Mr. Higgins' prior statements as impeachment evidence, such a claim is not appropriate for

federal habeas corpus review. A federal court may review a state prisoner's habeas petition only on the grounds that the challenged confinement is in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. 2254(a). A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988). The Court "'must defer to a state court's interpretation of its own rules of evidence and procedure' when assessing a habeas petition." *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005) (quoting *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988), *cert. denied*, 488 U.S. 1011 (1989) (citation omitted)). Only where the error resulted in the denial of fundamental fairness will habeas relief be granted. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988). *See McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir.), *cert. denied*, 543 U.S. 892 (2004) (citing *Estelle v. McGuire*, 502 U.S. 62, 69-70 (1991); *see also Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000), *cert. denied*, 532 U.S. 989 (2001) ("Errors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding.") (internal quotation marks and citation omitted). Petitioner has failed to demonstrate how the allegedly incorrect evidentiary ruling denied him a fair trial.

Nor did the prosecutor's use of Mr. Higgins' prior inconsistent statements during closing argument render petitioner's trial fundamentally unfair. As the Ohio Court of Appeals found, the prosecutor framed the issue of Mr. Higgins' testimony as one of credibility, advising the jury that the judge would instruct them on assessing a witness's credibility and that they should consider Higgins' testimony in view of his demeanor on the witness stand and any "bias or interest" he may have in the outcome of the case. (Doc. 8, Vo. 7 at Tr. 840-841). In addition, the trial court specifically instructed the jury that Mr. Higgins' prior inconsistent statements could only be used for

36

impeachment purposes and not to prove the truth of the matter asserted. (Doc. 8, Vol. 7 at Tr. 906). Importantly, there was considerable evidence identifying petitioner as the shooter independent of Mr. Higgins' prior statements. Upon review of the entire record, the undersigned is convinced that the evidentiary ruling and prosecutor's use of Mr. Higgins' prior statements were not sufficiently egregious to trigger fair trial concerns, and in any event, had at most only a minimal effect or influence on the jury's verdict in this case. *See Kotteakos v. United States,* 328 U.S. 750, 776 (1946); *see also O'Neal v. McAninch,* 513 U.S. 432, 436-38 (1995) (conviction must stand under "harmless error" standard if upon review of the entire record court is convinced that "the error did not influence the jury, or had but slight effect"). Petitioner, therefore, has not demonstrated he is entitled to habeas relief based on the claims alleged in Grounds Five through Seven of the petition.

## IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be DENIED with prejudice.

2. A certificate of appealability should not issue with respect to the petition because petitioner has failed to make a substantial showing of the denial of a constitutional right based on these claims. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3. With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore DENY petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a);

*Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date: _____

_____
Timothy S. Hogan
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

TIMOTHY L. JORDAN, JR.,
    Petitioner,

Civil Action No. 1:07-cv-559

Spiegel, J.

vs.

Hogan, M.J.

WARDEN, LEBANON CORRECTIONAL
INSTITUTION,
    Respondent.

### NOTICE

Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Hogan, United States Magistrate Judge, in the above-entitled habeas corpus action. Pursuant to Fed. R. Civ. P. 72(b), which may be applied in this action under Rules 1 and 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof. Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s). Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections. *See* Fed. R. Civ. P. 72(b). A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

39

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Timothy L. Jordan, Jr.
486-383
Lebanon Corr. Inst.
PO Box 56
Lebanon, OH 45036

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
  ☐ Addressee

B. Received by ( Printed Name) | C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
   ☑ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7001 2510 0008 6348 5826

PS Form 3811, August 2001      Domestic Return Receipt      102595-02-M-1540

1:07cv559  (Doc. 15)